UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
MICHAEL K. PETERSON,

        Plaintiff,                      Memorandum and Order
                                                  10 Civ. 480

        - against -

LONG ISLAND RAILROAD COMPANY

        Defendant.
------------------------------------------------------x
GLASSER, United States District Judge:

        Plaintiff Michael K. Peterson ("Peterson" or "plaintiff") brought this action

against his former employer, Long Island Rail Road Company ("LIRR" or "defendant"),

alleging retaliation in violation of the Family and Medical Leave Act of 1993 ("FMLA"),

29 U.S.C. §§ 2601 et seq., and race-based employment discrimination in violation of

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., The New

York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, et seq. (McKinney

2010), and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §

8-502.  Peterson also alleges intentional infliction of emotional distress under New York

State Law.  Before the Court is defendant's motion for summary judgment, pursuant to

Rule 56 of the Federal Rules of Civil Procedure.  For the reasons set forth below,

defendant's motion is GRANTED.

## BACKGROUND

        The following facts are undisputed unless otherwise noted.[1]  Peterson, an

African-American male, worked as an Electrician for the LIRR in the Department of

---

[1] Defendant urges the Court to deem admitted all statements contained in Defendant's
Statement Pursuant to Local Rule 56.1 ("Def.'s R. 56.1") on the grounds that Plaintiff's Counter-

Engineering for approximately 11 years.  He was represented by the International Brotherhood of Electrical Workers, Local 589 ("IBEW"), pursuant to a Collective Bargaining Agreement between LIRR and IBEW.  At all times relevant to his Complaint Peterson worked on Gang # 40, under the direct supervision of Gang Foreman Jerry Cummings ("Cummings").  Cummings' superior was Electrical Supervisor Vito Dorsi ("Dorsi").  Dorsi was responsible for the electrical facilities on the LIRR and oversaw 26 workmen, divided into four work crews or "gangs", including Gang # 40.  Declaration of Priscilla Lundin dated November 11, 2011 ("Lundin Decl.") Ex. E ("Dorsi Dep."), at 15.

On May 10, 2007, Peterson requested intermittent FMLA leave in order to care for his wife, who suffers from hypertension.  Lundin Decl. Ex. N.  This request was granted for the twelve-month period of July 1, 2007 to June 30, 2008.  See id. Ex. O.  During that period, Steven Daleo ("Daleo"), Chief Engineer, Planning & Administration, wrote to Peterson twice, updating him on the status of his FMLA leave.  By a letter dated March 17, 2008, Daleo notified Peterson that as of March 11, 2008, he had only 48 hours of FMLA leave remaining from his 480 hour entitlement.  Lundin Decl. Ex. P.  By a letter dated May 20, 2008, Daleo notified Peterson that as of April 21, 2008, he had exhausted his FMLA leave.  Lundin Decl. Ex. Q.

---

Statement Pursuant to Local Rule 56.1 ("Pl.'s R. 56.1") is deficient in numerous respects.  Failure to comply with Local Rule 56.1 permits a court to consider the facts at issue undisputed for the purposes of a summary judgment motion.  See Fed. R. Civ. P. 56(e)(2); Local Civil Rule 56.1(c). The Court declines to do so.  See Taylor & Fulton Packing, LLC v. Marco Int'l Foods, LLC, No. 09 Civ. 2614 (ILG), 2011 WL 6329194, at *4 n.2 (E.D.N.Y. Dec. 16, 2011) (noting "the Court has broad discretion to overlook defendants' failure to file a Rule 56.1 statement and may consider other admissible evidence submitted in opposition" (internal citation omitted)).  However, specific statements in defendant's Rule 56.1 statement will be deemed admitted if properly supported with admissible evidence and if plaintiff has failed to provide evidentiary support in opposition.  See id. at *4 (collecting cases).

## I.     Harassment

For seven months, Peterson took intermittent FMLA leave without incident. However, Peterson alleges that beginning in March 2008 and ending with his suspension from service on May 14, 2008, LIRR subjected him to harassment and disparate treatment, including "excessive scrutiny" and "verbal harassment" in retaliation for his taking FMLA leave.  Compl. ¶¶ 23-24; Lundin Decl. Ex. D ("Pl.'s Dep."), at 21-22.  Plaintiff alleges that he made verbal complaints to his immediate supervisor, Jerry Cummings ("Cummings"), about this harassment but he did not ask Cummings to take any action.  See Lundin Decl. Ex. C, ¶ 14.  Plaintiff did not make a complaint to any other members of management or the Diversity Management Department, although plaintiff testified that he was aware of the LIRR's Equal Employment Opportunity policies and the procedures for making a complaint.  See Pl.'s Dep. at 18-22.  Specifically, plaintiff alleges three incidents of harassment occurred:

### A.   March 2008

Plaintiff alleges that the harassment began in March 2008 when he was working at Inwood Station, installing a new service line.  Pl.'s Dep. at 24-25.  Peterson had just returned from four weeks of paid vacation.  Peterson alleges that Dorsi, his supervisor, approached him and said "Mike, so where were you?  Did you have a big project or something on your vacation?"  Id. at 25.  Peterson ignored the question, told Dorsi that he was working on live wiring, and continued working.  Id.  At the end of the working day, Peterson complained to Cummings that "I felt like I was being harassed because not only were [sic] I working on a live panel, he did not even ask – he came directly to me and pointed out statements.  No one else was – it's not like he conversed with anyone else."  Id. at 27.  Peterson testified that it was unusual for a Supervisor to speak directly

to him, rather than the Foreman.  Id. at 28.  Dorsi could not recall this conversation ever taking place.  Dorsi Dep. at 41.

### B.  April 8, 2008

On April 8, 2008, Peterson was working at Floral Park Station when he received a call from his wife that she was ill and needed to be taken to the hospital.  Pl.'s Dep. at 34.  Pursuant to FMLA policy, Peterson called his foreman, Cummings, and informed him he needed to leave.  Id. at 35.  According to Peterson, he also called Dorsi, who approved Peterson leaving.  However, Peterson alleges that Dorsi later visited Floral Park, looking for him, and told Cummings that he "didn't like the way that went down."  Id.  Peterson interpreted Dorsi's statement as a form of harassment for his taking FMLA leave.  Id. at 39.

Defendant disputes plaintiff's account.  Dorsi testified that Peterson did not call him and the first he heard of Peterson's absence was when he visited the Floral Park Station on a routine site visit.  Dorsi Dep. at 41-42.  Cummings told him that Peterson had had something to eat that didn't agree with his stomach and had gone home sick.  Id. at 44.  Dorsi then called Peterson on his cell phone and Peterson told him he was not sick but taking FMLA leave to care for his wife.  Id. at 46.  Dorsi testified that he was angry with Cummings for failing to keep him informed and was concerned that either Cummings or Peterson had not been honest about the reasons for Peterson's absence.  Id. at 47, 51-52, 59.  Peterson and Cummings are close friends: Peterson was the best man at Cummings' wedding.  Pl.'s Dep. at 60.  Dorsi testified that he reprimanded Cummings for not reporting Peterson's absence right away.  Id. at 45, 48-49.

The time sheet Cummings prepared for that day records Peterson as "Time Stopped at 1:30p – sick (FMLA)."  Lundin Decl. Ex. S.  At deposition, plaintiff admitted

that he improperly received paid sick leave for the time he took off on April 8, 2008 when, in fact, he was caring for his wife on FMLA time, which is unpaid.  Pl.'s Dep. at 52-54; <u>see also</u> Lundin Ex. R (Employee Attendance Report indicating plaintiff took sick leave on April 8, 2008 and FMLA leave for the following three days).

> C.  May 14, 2008

On May 14, 2008, Peterson was working at Douglaston Station with his coworkers Dave Williams and Malikee Joseph, both of whom are African-American. Pl.'s Dep. at 40-41.  Dorsi visited the job site to check on the crew but did not see Peterson there.  Dorsi asked Williams and Joseph if Peterson was at work and they said that he was.  Dorsi Dep. at 67-68.  According to Peterson, Dorsi returned later in the afternoon and spoke with the men again, asking if Peterson had been at work all day. Pl.'s Dep. at 43.  When Peterson learned of this, he confronted Dorsi as Dorsi was leaving the job site.  Both men testified that Peterson began the conversation by asking Dorsi to speak to him directly and not to ask his colleagues about his attendance. Peterson alleges Dorsi became angry and defensive, Pl.'s Dep. at 44; Dorsi alleges Peterson used foul language and began threatening him, Dorsi Dep. at 70-71.  It is undisputed that the argument escalated into shouting and Williams and Joseph intervened, separating Peterson and Dorsi.  Peterson testified that they "stepped in front of us."  Pl.'s Dep. at 45.  Dorsi recalled they had to physically restrain Peterson and that in the struggle Williams fell to the ground and tore his jeans.  Dorsi Dep. at 71-72. Peterson testified that at one point in the argument, he said "Well, I'm doing what I am supposed to.  I'm here," to which Dorsi responded, "You people abuse your FMLA."  <u>Id.</u> at 45.  The only two employees in Gang # 40 taking FMLA leave were Peterson and Cummings, both of whom are African-American.  Dorsi is Caucasian.  Plaintiff

interpreted Dorsi's statement to be a reference to his race.  Compl. ¶ 27.  Dorsi denies

ever making such a statement.  Dorsi Dep. at 81.

## II.    Disciplinary Proceedings

After the argument, Dorsi called his supervisor, Joseph Conway ("Conway"), to

report the incident.  Conway ordered everyone involved to report to his office in

Bethpage.  Lundin Decl. Ex. F, at 14.  Dorsi, Cummings, Peterson, Williams, Joseph, and

Vinny Cuomo, an IBEW union representative, met there.  Id. at 14.  After speaking with

Dorsi and Cummings and taking written statements from Williams and Joseph, Conway

suspended Peterson from service.  Pl.'s Dep. at 65; Lundin Decl. Ex. F, at 29, 36.

Conway testified that based on his own observations of Peterson in Bethpage he believed

him to be a threat to himself or others.  Lundin Decl. Ex. F, at 31.

### A.  First Disciplinary Proceeding

On May 16, 2008 LIRR issued a Notice of Trial, charging Peterson with

"Assaulting Two Employees; Threatening a Supervisor with Physical Harm; Conduct

Unbecoming an Employee."  Compl. ¶ 29; Lundin. Decl. Ex. U.  Peterson's disciplinary

trial was held on June 9 and July 10, 2008.  Peterson attended the trial, represented by

the IBEW, and had the opportunity to testify, call witnesses, cross examine LIRR's

witnesses, and make a closing statement.  Pl.'s Dep. at 63.  At the conclusion of the trial,

the trial transcripts and exhibits were forwarded to Steven Daleo, the reviewing officer,

who found the evidence supported the charges and determined termination was

appropriate.  Daleo Decl. ¶ 31; Lundin Decl. Ex. X (Notice of Dismissal).

On September 2, 2008, the IBEW appealed Peterson's dismissal.  Michael D.

Chirillo ("Chirillo"), then-Director of Labor Relations (Administration) for the LIRR,

conducted an appeals hearing on September 30, 2008.  See Declaration of Michael D.

Chirillo, dated November 10, 2011 ("Chirillo Decl.") ¶¶ 8-10. At the hearing, Chirillo proposed reducing Peterson's dismissal to a 30 working day suspension and to pay Peterson 30 working days of back pay, if Peterson pled guilty. Id. ¶ 11. Peterson declined this offer on October 20, 2008. Id. ¶ 12. Two days later, Chirillo modified Peterson's dismissal to a time-out-of-service suspension of approximately 5 ½ months, reinstating his employment with LIRR. Id. ¶ 13.

In accordance with the Collective Bargaining Agreement, Peterson was directed to submit to a physical with the LIRR Medical Facility so that he could be approved to return to work. Id. ¶ 14. By a letter dated October 30, 2008, LIRR instructed Peterson to attend a physical on November 6, 2008. Lundin Decl. Ex. FF. Peterson failed to appear on that date. LIRR sent a second letter, dated November 10, 2008, directly ordering Peterson to attend a physical on November 20, 2008. Id. Ex. GG. In that letter, LIRR warned Peterson that failure to comply with the order would result in trial charges. Peterson again failed to appear.

By a letter dated November 25, 2008, Peterson wrote to Joseph Conway, stating that, "[a]s a result of the continuing discriminatory harassment and retaliation, I will not continue to work for the MTA. Unfortunately, my complaints have been ignored and I cannot continue at the MTA." Lundin Decl. Ex. HH. Conway responded by letter, informing Peterson that this could not be considered a letter of resignation because LIRR requires employees to surrender their employee pass, keys, and all LIRR tools, together with a letter of resignation. Lundin Decl. Ex. JJ.

B. Second Disciplinary Proceeding

On November 26, 2011, LIRR issued a Notice of Trial, charging Peterson with "Insubordination; Failure to Report to the LIRR Medical Facility; Failure to Follow a

Direct Order; Job Abandonment." Lundin Decl. Ex. II. On January 16, 2009, LIRR held a disciplinary trial. Id. Ex. KK (Transcript of Engineering Trial Case No. P08-086). Peterson did not attend the trial but was again represented by the IBEW. On February 11, 2009, reviewing officer Jenine Mehm, Engingeering's Senior Manager, Planning & Administration, found that the trial record supported the charges and determined the appropriate discipline to be dismissal. Declaration of Jenine Mehm dated November 10, 2011 ¶ 5; Lundin Decl. Ex. LL (Notice of Dismissal).

Peterson appealed his February 11, 2009 dismissal and Chirillo held an appeals hearing on April 7, 2009. Chirillo Decl. ¶ 23. Peterson did not attend but was represented by the IBEW. Id. Chirillo affirmed Peterson's dismissal. Id. ¶ 27.

### III.    Arbitration

Following his second appeal, Peterson appealed to the Public Law Board, authorized by the National Mediation Board. See Lundin Decl. Ex. NN. On August 10, 2010, an arbitral hearing was held, with submissions made by LIRR and IBEW. Chirillo Decl. ¶ 28. On October 16, 2010, the Public Law Board upheld LIRR's dismissal of Peterson. Lundin Decl. Ex. QQ.

### IV.    EEOC Complaint

By a complaint dated October 28, 2008, Peterson filed a claim with the New York State Division of Human Rights, alleging discrimination based on his race. Lundin Decl. Ex. CC. As part of the dual-filing system, this complaint was also filed with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a "Notice of Right to Sue" letter to plaintiff on November 6, 2009. Compl. ¶ 10; Lundin Decl. Ex. DD. On February 3, 2010, plaintiff filed his Complaint.

## JURISDICTION

This Court has original jurisdiction over plaintiff's FMLA and Title VII claims, claims arising under federal law. The Court also has supplemental jurisdiction over plaintiff's state law discrimination claims and common law claim for intentional infliction of emotional distress. Federal courts have supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A state law claim forms part of the same controversy if the state and federal claim "derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966). Here, the parties and alleged events and injuries that are the grounds for plaintiff's federal claims are identical to those of plaintiff's state law claims.

## DISCUSSION

### I.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As an initial matter, the moving party has the burden of demonstrating that no genuine dispute of material fact exists for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

Once the moving party has met this burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'"  Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting Matsushita, 475 U.S. at 586–87).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

The Court is compelled to draw all reasonable inferences in favor of the nonmoving party, Matsushita, 475 U.S. at 586, and a genuine dispute exists if a reasonable jury could find in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249–50 (citations omitted).  "[T]he mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment.  Id. at 247–48 (emphasis in original).  "Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth 'concrete particulars' showing that a trial is needed."  R.G.

Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (quoting S.E.C. v. Res. Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978)).

## II.     The FMLA

Under the FMLA, eligible employees are entitled to a total of 12 work weeks of unpaid leave per year in order to care for a spouse or immediate family member with a serious health condition.  29 U.S.C. § 2612(a)(1)(C).  Employees who utilize such leave must be allowed to return to their position or an "equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(B).  In addition, the FMLA makes it unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA.  29 U.S.C. § 2615(a)(1).  Regulations promulgated pursuant to the FMLA also prohibit employers from discriminating or retaliating against employees who have used FMLA leave.  29 C.F.R. § 825.220(c).  Here, plaintiff alleges that defendant retaliated against him for taking FMLA leave by subjecting him to excessive scrutiny, harassment, and discriminatory disciplinary actions.  Compl. ¶¶ 23, 38.

Retaliation claims under the FMLA are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004). Under the McDonnell Douglas framework, plaintiff must first establish a prima facie case of discrimination by demonstrating: 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.  Id.  Although the standard to establish a prima

facie case is not high, conclusory allegations alone are insufficient.  <u>Sharif v. Buck</u>, 152 F. App'x 43, 44 (2d Cir. 2005) (summary order).

The first two elements are undisputed: plaintiff took approved FMLA leave and was qualified for his position as an electrician.  Regarding the third element, plaintiff essentially alleges that in retaliation for taking FMLA leave, he was subject to two types of adverse employment action: first, that his supervisor, Dorsi, subjected him to excessive scrutiny and harassment, including "yelling and screaming at him on May 14, 2008," and, second, that he was suspended and subject to unfair disciplinary proceedings and termination.  Plaintiff's Memorandum in Opposition ("Pl.'s Mem.") at 20.

A.  Dorsi's Alleged Harassment of Plaintiff

In the FMLA context, an "adverse employment action" includes not only materially adverse changes in the terms and conditions of employment, <u>Sanders v. N.Y. City Human Res. Admin.</u>, 361 F.3d 749, 755 (2d Cir. 2004), but also any action "harmful to the point that it could well dissuade a reasonable worker from exercising her rights under the Act.  This standard protects not from all retaliation, but from retaliation that produces injury or harm."  <u>Behringer v. Lavelle Sch. for the Blind</u>, No. 08 Civ. 4899 (JGK), 2010 WL 5158644, at *15 (S.D.N.Y. Dec. 17, 2010) (internal quotations omitted) (citing <u>Ragusa v. Malverne Union Free Sch. Dist.</u>, 381 F. App'x 85, 90 (2d Cir. 2010) (summary order)).

No reasonable jury could find that Dorsi's interactions with plaintiff constituted an adverse employment action.  While it is true that "the accumulation of small reprisals may be aggregated so as to permit consideration of their impact in their totality," Pl.'s Mem. at 19, even in the aggregate Dorsi's actions cannot be said to rise to this level.

First, plaintiff alleges that in March 2008, Dorsi spoke to him while he was working and asked him what he had done on his vacation. Peterson claims he was harassed because Dorsi had not previously spoken to him and it was none of Dorsi's business how he spent his vacation. No reasonable person could consider such a commonplace conversation to be harassment or retaliation.

During the second incident, on April 8, 2008, Dorsi told Cummings that he "didn't like how that went down," after Peterson left a work site mid-day to care for his wife. Peterson alleges Dorsi's statement was a form of harassment for his having taken FMLA leave. However, Peterson testified that when he telephoned Dorsi to report he was leaving, Dorsi immediately agreed and did not express any disapproval or objection. Pl.'s Dep. at 36-37. Dorsi also signed off on Peterson's time sheet without incident. Id. at 51-52; Dorsi Dep. at 50. Even accepting plaintiff's version of events as true, no reasonable worker would be deterred from exercising their FMLA rights by such an ambiguous comment to a third party.

The third incident was the confrontation between Peterson and Dorsi on May 14, 2008. Peterson alleges the argument was precipitated by Dorsi harassing him by checking his attendance at the job site. However, it is undisputed that visiting jobs sites was one of Dorsi's required duties. Pl.'s R. 56.1; Dorsi Dep. at 56-57. Among other things, Dorsi monitored attendance and approved the daily labor sheets prepared by the Foremen, recording Gang attendance. Pl.'s R. 56.1 ¶ 50; Affidavit of Jeffrey M. Cummings dated Dec. 6, 2011 ("Second Cummings Aff.") ¶ 8. Plaintiff himself submitted records showing that Dorsi visited job sites and inspected work crews almost daily. See Affirmation of Jason L. Abelove ("Abelove Aff.") Ex. F. Although plaintiff asserts that Dorsi disproportionately visited Gang 40 in the Spring of 2008 and he

interpreted this as excessive scrutiny of his attendance, the records plaintiff submitted show that in the months leading up to this incident Dorsi visited Gang 40 no more often than Gangs 38 or 35, which were also under his supervision.  See id.

In opposition to defendant's motion, plaintiff submitted an affidavit from Cummings, asserting that in the Spring of 2008, Dorsi constantly asked about Peterson's whereabouts, "kept tabs" on him, and scrutinized his FMLA leave.  Second Cummings Aff. ¶¶ 10-11, 13.  This affidavit directly contradicts Cummings' prior sworn affidavit, stating that Dorsi never made statements about Peterson's attendance or FMLA leave.  See Lundin Decl. Ex. G (Affidavit of Jerry M. Cummings dated May 25, 2011).  "[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  Hayes v. N.Y. City Dept. of Corr., 84 F.3d 614, 618 (2d Cir. 1996); see also Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").  If a party could raise an issue of fact simply by submitting an affidavit, contradicting the affiant's prior sworn statements, "'this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'"  Hayes, 84 F.3d at 618 (quoting Perma Res. & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)).  Thus, Cummings' second affidavit fails to create "genuine" issues for trial.  In light of the foregoing, plaintiff has submitted no evidence that would support the conclusion that Dorsi unfairly targeted him or harassed him by checking his attendance.  The FMLA prohibits employers from discouraging or interfering with employees' FMLA leave, or retaliating against employees who take FMLA leave.  But it does not prohibit employers from

monitoring employee's attendance or investigating whether employees have engaged in misconduct. While there may be instances where monitoring is so oppressive and unjustified that it could dissuade a worker from exercising his FMLA rights,[2] plaintiff has provided no evidence that he was subject to anything more than reasonable supervision.

As for the argument between Peterson and Dorsi, Peterson testified that he initiated the confrontation with Dorsi, that they both raised their voices, and that his coworkers intervened but did not need to physically restrain the two men. Peterson does not allege that Dorsi threatened him physically or verbally. Viewing the evidence in the light most favorable to the plaintiff, as the Court must on summary judgment, Peterson's description is that of an isolated argument, not harassment. Nevertheless, even if the Court were to consider Dorsi "yelling and screaming" to be an adverse action, the circumstances do not give rise to an inference of retaliatory intent. The sole grounds for inferring retaliatory intent is the statement, "you people abuse your FMLA." Plaintiff himself admitted that on April 8, 2008 he was improperly paid full wages for sick leave, when he in fact was caring for his wife and should have received unpaid FMLA leave. Pl.'s Dep. at 51-54, 58. Plaintiff had nearly exhausted his FMLA leave and he did not notify LIRR of this error. Id. at 54. The obvious purpose of the FMLA's prohibition on retaliation and interference is to protect employees' legitimate use of FMLA leave. A truthful accusation of impropriety can hardly be grounds for a claim. For the foregoing

---

[2] Defendant argues that increased monitoring and scrutiny cannot constitute an adverse employment action. See Def.'s Reply Mem. at 14-15 (citing Lawson v. N.Y. City Bd. Of Educ., No. 05 Civ. 825 (JSR) (HBP), 2011 WL 869282 (S.D.N.Y. Feb. 25, 2011). The Court is not persuaded that this rule is applicable. The cases to which defendant cites concern Title VII claims. Title VII requires a "materially adverse change" to the conditions of plaintiff's employment. In contrast, the FMLA prohibits not just materially adverse changes but actions which interfere with, restrain, or deter employee's use of FMLA entitlements, a lesser showing.

reasons, plaintiff has failed to show that Dorsi subjected him to harassment or undue scrutiny or that his treatment of plaintiff was motivated by hostility towards plaintiff's legitimate use of FMLA leave.

A. Plaintiff's Suspension and Discipline

Plaintiff's suspension and subsequent disciplinary proceedings qualify as adverse employment actions. See, e.g., Phillip v. City of New York, No. 09 Civ. 442 (ILG), 2012 WL 1356604, at *8 (E.D.N.Y. Apr. 19, 2012) (suspension from duties and disciplinary proceedings constituted "adverse employment actions"). Regarding the fourth element —evidence inferring retaliatory intent—plaintiff argues that "the fact that a number of similarly situated employees, who were not on FMLA leave, and who 'pled' guilty to physical and/or verbal assaults of other employees, were not disciplined as harshly as he was disciplined, could certainly lead a reasonable fact finder to conclude that the treatment of the Plaintiff was based on his FMLA leave." Pl.'s Mem. at 20; see also Compl. ¶ 35 ("Similarly situated white employees who are guilty of equivalent and even more serious offenses are not punished as severely.").

In support, plaintiff submitted disciplinary records from five other employees.[3] See Abelove Aff. Ex. G. The records show that in 1993, Joseph Conway was in a fight with a supervisor and accepted a 30-day suspension in lieu of going to trial. In April 2001, Dennis Ochoa assaulted a subordinate employee and accepted a three-month suspension in lieu of going to trial. In November 2001, Steve Matoni fought with a security guard and accepted a 30-day suspension in lieu of going to trial. In 2004, James Gomez was charged with threatening a supervisor. He accepted a 5-day

---

[3] None of the five employees are African-American, Peterson Aff. ¶ 88, and plaintiff also cites to their disciplinary records as evidence of disparate treatment based on race. That argument is addressed below.

suspension in lieu of going to trial.  And on March 25, 2011 Christopher Egner and Jose

Morales shoved and pushed each other.  Egner, who initiated the shoving, accepted a

10-day suspension and Morales accepted a one-day suspension, both waiving their right

to trial.  In contrast, plaintiff was initially terminated and then, on appeal, given a five-

month suspension.[4]

What plaintiff fails to note is that all of these men pled guilty and waived their

right to trial.  Because they accepted responsibility, they were not 'similarly situated' to

plaintiff, who proceeded to trial.  It is undisputed that plaintiff was offered a 30-day

suspension and 30 days' back pay in exchange for pleading guilty, the same punishment

given to Conway and Matoni and significantly less than the three months' punishment

given to Ochoa.  He did not accept this offer.

Plaintiff also alleged in the Complaint that he was not given a statement of

charges or an opportunity to rebut the charges in writing, which was "highly unusual."

Compl. ¶ 30.  Plaintiff has submitted no evidence, aside from this conclusory assertion,

that LIRR was obligated to provide him with such an opportunity at the time of the

incident or that other employees who did not take FMLA leave were permitted such a

rebuttal.  The record shows that LIRR produced a statement of charges within 48 hours

of the incident and held a full disciplinary hearing at which plaintiff had an opportunity

to testify, call witnesses, give closing arguments, and be represented by his union.

Plaintiff has submitted no other evidence that would show he was treated

differently from employees who did not take FMLA leave, that his FMLA leave was a

factor in the disciplinary proceedings, or that would otherwise permit an inference of

---

[4] Plaintiff was retroactively suspended for the time that he had been out of service during the disciplinary hearings.  The undisputed record indicates that his suspension was made more lengthy by his union repeatedly postponing the disciplinary proceedings, delaying resolution of the matter.  See Lundin Decl. Ex. V (Timeline of Trial).

retaliatory intent.  Because plaintiff has failed to establish a prima facie case, summary judgment must be granted as to plaintiff's FMLA claims.

B.  Constructive Discharge

In addition to the foregoing, plaintiff also apparently alleges that he was constructively discharged.  <u>See</u> Compl. ¶ 36; Pl.'s Mem. at 23-25.  It is unclear whether plaintiff is alleging constructive discharge as an adverse employment action or as a separate cause of action but, in any event, plaintiff's claim fails.  "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily."  <u>Chertkova v. Conn. Gen. Life Ins. Co.</u>, 92 F.3d 81, 89 (2d Cir. 1996).  "Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  <u>Id.</u> (internal quotation marks and citation omitted).

Plaintiff apparently premises his claim upon his November 25, 2008 resignation letter.  <u>See</u> Lundin Decl. Ex. HH.  Plaintiff alleges that he was forced to resign because his working conditions were made intolerable by (1) Dorsi's harassment and (2) his disparately harsh disciplinary treatment, compared with similarly situated non-Black employees who are not on FMLA leave.  For the reasons discussed previously, plaintiff has not shown that he was harassed or subject to disparate discipline.  Plaintiff also claims that he could not accept a five-month suspension and return to work because he had not been offered a change in work location and feared continued harassment from Dorsi.  <u>See</u> Peterson Aff. ¶ 70.  There is no evidence that plaintiff ever requested such a change in assignment from LIRR.  To the extent that plaintiff alleges he was constructively discharged, summary judgment is also granted as to this claim.

## III.  Race Discrimination

### A.  Title VII and the NYSHRL

Plaintiff alleges defendants subjected him to discrimination based on his race pursuant to Title VII and the NYSHRL.  Compl. ¶¶ 43, 48.  These claims are also analyzed under the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>.  <u>See</u> <u>Vivenzio v. City of Syracuse</u>, 611 F.3d 98, 106 (2d Cir. 2010) (noting the basic analytical framework for claims under Title VII and the NYSHRL is the same).  Under the <u>McDonnell Douglas</u> framework, plaintiff must first establish a prima facie case of discrimination by demonstrating: (1) he is a member of a protected class; (2) he was qualified for his position or was performing his duties satisfactorily; (3) he suffered an adverse employment action; and (4) there is some evidence of a causal connection between his membership in a protected class and the adverse employment action.  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

The first two elements are undisputed: plaintiff, an African-American, is a member of a protected class and was qualified for his position.  Regarding the third and fourth elements, plaintiff relies upon the same alleged adverse employment actions as those that form the basis of his FMLA claim.  <u>See</u> Compl. ¶¶ 42-43.  Even assuming these actions qualified as adverse employment actions, plaintiff has failed to show any causal connection between his race and the adverse actions taken against him.  Plaintiff's only grounds for an inference of racial animus are:  1) Dorsi's alleged statement that "you people abuse your FMLA leave;" and 2) his disparately severe disciplinary treatment, compared with five employees who were not African-American.  Pl.'s Mem. at 21.  For the reasons discussed previously, those five employees were not

similarly situated to plaintiff and no inference of discrimination can be drawn from those records.

As for Dorsi's statement on May 14, 2008, plaintiff argues that "based on this statement, and the fact that the only two employees under Mr. Dorsi's supervision at that time who were on FMLA – the Plaintiff and Mr. Cummings, the foreman – were both African-American, a jury could certainly find that the treatment of the plaintiff was based on his race."  Pl.'s Mem. at 21.  First, it is not clear that "you people" was a reference to plaintiff's race.  At the time Dorsi allegedly made this statement, all three workers present were African-American and of the 26 men under his supervision, at least 8 were African-American.  Dorsi Dep. at 17.  However, only two African-Americans—Cummings and Peterson—had taken FMLA leave.   Thus, "you people" more logically referred to the fact that Peterson and Cummings were on FMLA leave, not their race.

However, even if it were a reference to plaintiff's race, summary judgment would be warranted.  Stray remarks, made without any other indicia of discrimination, do not constitute sufficient evidence to support a case of employment discrimination.  Danzer v. Norden Sys. Inc., 151 F.3d 50, 56 (2d Cir. 1998); Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) ("[S]tray remarks [even] of a decision-maker, without more, cannot prove a claim of employment discrimination.").  Plaintiff has provided no other evidence of racial animus.  For the foregoing reasons, plaintiff has failed to establish a prima facie case of racial discrimination and summary judgment is granted as to plaintiff's Title VII claims.

B.  The NYCHRL

NYCHRL claims must be considered separately from federal and state law discrimination claims. Vargas v. Morgan Stanley, 438 F. App'x 7, 10 (2d Cir. 2011) (summary order). Previously, courts interpreted the NYCHRL as coextensive with Title VII and the NYSHRL. The New York City Council rejected such equivalents by passing the Local Civil Rights Restoration Act of 2005. Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 277–79 (2d Cir. 2009) (explaining the 2005 Act "abolish[ed] 'parallelism' between the [NYCHRL] and federal and state anti-discrimination law").

To state a discrimination claim under NYCHRL, plaintiff need not show that an employment action was materially adverse; any manner of discrimination is prohibited. See Margherita v. FedEx Exp., No. 07 Civ. 4826 (NG) (RER), 2011 WL 5024577, at *8 (E.D.N.Y. Oct. 20, 2011). Nevertheless, a plaintiff must still link the adverse employment action to a discriminatory motivation and where a plaintiff fails to do so, his claims fail. Id. For the reasons discussed above, Peterson has failed to make such a link and plaintiff's NYCHRL claim must also be dismissed.

## IV. Intentional Infliction of Emotional Distress

Under New York law, plaintiff must establish the following four elements to show intentional infliction of emotional distress: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress. See Howell v. N. Y. Post Co., Inc., 81 N.Y.2d 115, 121, aff'd in part, 82 N.Y.2d 690, 619 (1993). The elements of the rule "are rigorous and difficult to satisfy." Id. at 122.

Plaintiff has provided no evidence of the "extreme and outrageous conduct" necessary to meet the high bar set in New York for recovery for intentional infliction of

emotional distress. "The conduct alleged must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Reyes v. Fairfield Props., 661 F. Supp. 2d 249, 270 (E.D.N.Y. 2009) (quotation omitted). "Acts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain a claim of intentional infliction of emotional distress because the conduct alleged is not sufficiently outrageous." Lydeatte v. Bronx Overall Econ. Dev. Corp., No. 00 Civ. 5433 (GBD), 2001 WL 180055, at *2 (S.D.N.Y. Feb. 22, 2001). Consequently, "[a]s a general proposition, adverse employment actions, even those based on discrimination, are not sufficient bases for intentional infliction claims." Emmons v. City Univ. of N. Y., 715 F. Supp. 2d 394, 424 (E.D.N.Y. 2010). Even taking all of Peterson's allegations as true, defendant's conduct does not meet the required standard, and summary judgment is also granted as to plaintiff's claim for intentional infliction of emotional distress.

## CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment is granted as to all claims.  The Clerk of the Court is respectfully directed to close the case.


**SO ORDERED.**

Dated:       Brooklyn, New York
              June 19, 2012


                                              ___/s/_____
                                              I. Leo Glasser
                                              United States District Judge